**BANCO NACIONAL DE CUBA,**
Plaintiff,

v.

Peter L. F. **SABBATINO** as Receiver, and F. Shelton Parr, William F. Prescott, Emet Whitlock, Lawrence H. Dixon, H. Bartow Farr, Elizabeth C. Prescott, Fabio Freyre and Helen G. Downs, co-partners doing business as Farr, Whitlock & Co., Defendants.

United States District Court
S. D. New York.

March 31, 1961.

See also 27 F.R.D. 255.

Rabinowitz & Boudin, New York City, for plaintiff, Victor Rabinowitz, New York City, of counsel.

Harold L. Fisher and Ross J. Di-Lorenzo, Brooklyn, N. Y., for defendant Peter L. F. Sabbatino.

Choate, Mitchell, Baker & Nelson, New York City, for defendant Farr, Whitlock & Co., Robert L. Augenblick, Winthrop S. Emmet, New York City, of counsel.

DIMOCK, District Judge.

There are six motions before me in this complicated commercial litigation having its genesis in the Cuban nationalization situation.

The action centers about title to a sugar shipment which plaintiff, the financial agent of the Cuban government, asserts by reason of expropriation of the property of Compania Azucarera Vertientes-Camaguey, hereinafter C.A.V., a Cuban corporation, under a nationalization decree. The proceeds of the sale of this sugar shipment are now in the possession of the New York State Supreme Court for Kings County which, under section 977–b of the New York Civil Practice Act, appointed a temporary receiver for the assets of C.A.V. located in New York. The receiver has been made a defendant in this action, although leave to sue him was not obtained from the court that appointed him. The remaining defendants are members of a New York partnership, Farr, Whitlock & Co., hereinafter referred to as Farr Whitlock.

The following facts are agreed upon for the purpose of the present motions. In February and July of 1960, Farr Whitlock contracted to purchase sugar from a wholly-owned Cuban corporate subsidiary of C.A.V. The contracts called for the purchase of specified amounts of sugar at specified prices free alongside steamers. The seller was to supply cargo to vessels assigned by Farr Whitlock at a designated Cuban port. Payment was to be made by Farr Whitlock in New York upon presentation of the necessary shipping documents.

Loading of the sugar onto a German vessel assigned by Farr Whitlock commenced on August 6, 1960, a Saturday, continued on August 8th and was completed by 1 p. m. on August 9th. Since there was no wharf at the Cuban port, the sugar was carried on barges to the vessel.

On August 6, 1960, the Cuban President and Prime Minister signed a resolution nationalizing the property of C.A.V. and other named Cuban corporations. Both the resolution and the law pursuant to which it was adopted declared that nationalization of Cuban enterprises in which United States "physical and corporate persons" held a majority interest was deemed a necessary defensive measure against the recent aggressive acts of the Congress and President of the United States reducing the participation of Cuban sugars in the American sugar market.

Farr Whitlock, in order to obtain the necessary consent of the Cuban government to have the loaded vessel depart, on August 11, 1960 entered into contracts with plaintiff's assignor, a government wholly-owned corporation. The contracts purported to sell to Farr Whitlock the sugar on board the vessel. The contracts contained, insofar as here relevant, the same terms as those in the original agreements between Farr Whitlock and the C.A.V. subsidiary. The vessel departed for Casablanca, Morocco on August 11, 1960.

The sight draft and bills of lading covering the sugar shipment were delivered to Farr Whitlock, at its office in New York City, by plaintiff's agent. Farr Whitlock accepted the documents, negotiated the bills of lading to its customer and received the purchase price, in the amount of $175,250.69. Farr Whitlock did not, however, pay the proceeds to plaintiff's agent, since it had been advised that a receiver appointed by the New York State Supreme Court for

C.A.V. claimed the right to the sales proceeds.

The receiver had been appointed pursuant to a statute authorizing receiverships for New York assets of foreign corporations that have been dissolved or the property of which has been nationalized. See New York Civ.Prac.Act § 977–b.

The state court which had appointed the receiver enjoined Farr Whitlock from disposing of the sales proceeds and subsequently issued an order, with which Farr Whitlock has complied, directing turnover of the sum to the receiver. The order directed the receiver to deposit the proceeds in the Kings County Trust Company "to be held by it subject to the further order of the court and not to be withdrawn except on such order."

Plaintiff in the present action, alleging conversion of the bills of lading and the sales proceeds, seeks recovery either from Farr Whitlock or from the receiver. Plaintiff also, claiming that section 977–b of the New York Civil Practice Act violates the United States Constitution, seeks appropriate relief by way of injunction and declaratory judgment. Farr Whitlock in the event that it is held liable to plaintiff seeks recovery over from the receiver.

I have before me the following six motions:

1. The receiver's motion to dismiss the complaint as against him because of failure to obtain leave from the receiver's appointing court to sue him.

2. The receiver's motion to dismiss the amended complaint on the same ground.

3. The receiver's motion to dismiss Farr Whitlock's cross-claim against him on the same ground.

4. Farr Whitlock's motion to dismiss the action against it for lack of jurisdiction over the subject matter.

5. Plaintiff's motion for summary judgment against Farr Whitlock and the receiver.

6. Farr Whitlock's motion for summary judgment against the receiver in the event plaintiff is granted summary judgment against Farr Whitlock.

I shall consider first Farr Whitlock's motion to dismiss the action against it for lack of jurisdiction of the court over the subject matter. Farr Whitlock relies on the well-established rule that, when a state court action and a federal court action are both in rem or quasi in rem and involve the same property, then the court first perfecting its jurisdiction over the property may maintain and exercise that jurisdiction to the exclusion of the other. Farr Whitlock's reasoning in support of its motion is impeccable up to a certain point. It argues that the state court receivership action is in rem or quasi in rem, which is quite true. See Oliner v. American-Oriental Banking Corp., 2nd Dept., 252 App.Div. 212, 297 N.Y.S. 432, affirmed without opinion, 277 N.Y. 588, 13 N.E.2d 783. It then argues that the state court first perfected jurisdiction over the sales proceeds here in issue, which is also true. But at this point Farr Whitlock's argument falters, since plaintiff in the present action seeks merely to hold Farr Whitlock personally liable for its alleged conversion of the documents delivered to it by plaintiff's agent as well as its alleged conversion of the sales proceeds. Application of the test laid down in United States v. Bank of New York & Trust Co., 296 U.S. 463, 477, 56 S.Ct. 343, 80 L.Ed. 331, leads to the inescapable conclusion that the present action against Farr Whitlock is not in rem or quasi in rem, for this court does not require possession or control of the sales proceeds of the sugar shipment in order to proceed with the cause and grant the relief sought, a money judgment against Farr Whitlock. Since the action against Farr Whitlock is in personam, it may proceed simultaneously with the state court action. United States v. Klein, 303 U.S. 276, 58 S.Ct. 536, 82 L.Ed. 840; see Markham v. Allen, 326 U.S. 490, 66 S.Ct. 296, 90 L. Ed. 256. Nor may this court decline to exercise or postpone exercise of its jurisdiction pending a state court determination, for such abstention here would

serve no important countervailing interest. See County of Allegheny v. Mashuda, 360 U.S. 185, 79 S.Ct. 1060, 3 L. Ed.2d 1163. Farr Whitlock has had ample opportunity to protect itself from double liability in the event that it loses this law suit and the state court determines that C.A.V. had title to the sales proceeds within that court's possession. Up until now Farr Whitlock has not impleaded C.A.V. in this action and it has offered no explanation for its failure to do so.[1] Perhaps the reason lies in the fact that Farr Whitlock has an indemnification agreement with C.A.V. which protects it against double liability. Be that as it may, it is even doubtful whether a determination in the state court action would have any effect in this action. Plaintiff has not appeared in the state court action, and, although its agent who presented the documents to Farr Whitlock for collection has made an appearance, plaintiff denies that its collection agent represents its interest in the state court action. There is thus no need to decide whether the danger of double liability would indeed be sufficient reason for this court to abstain from exercising jurisdiction insofar as the claim against Farr Whitlock is concerned pending the outcome of the state court proceeding.

The motion to dismiss for lack of jurisdiction over the subject matter is therefore denied.

Since I have come to the conclusion that, on plaintiff's motion for summary judgment against defendants Farr Whitlock and the receiver, those defendants are entitled to summary judgment dismissing the complaint, all of the rest of the motions are dismissed as moot.

I turn now to plaintiff's motion for summary judgment against Farr Whitlock and the receiver. Defendants' first claim is that plaintiff lost nothing by Farr Whitlock's failure to pay the draft because the terms of the nationalization decree did not embrace the sugar shipment at issue and plaintiff therefore had no interest in the sugar or the purchase price. Defendants' second claim is that, even if the decree did purport to affect the sugar, the sugar was located outside of Cuban territory when the decree took effect and hence courts of this country will not recognize the decree's extraterritorial effect. Defendants' third claim is based on the asserted unenforceability of the decree in courts of this country even if the decree on its effective date did relate to the sugar in issue and this sugar was situated within Cuban territory.

Defendants express their first claim as a claim that title had already passed to Farr Whitlock when the nationalization decree took effect. That is not the question, however. The question is whether C.A.V. had any interest in the sugar when the nationalization decree took effect.[2] The problem immediately arises as to the law which governs the rights of the parties with respect to the ownership of the sugar. The choice lies between Cuban law and New York law. I find it unnecessary to make a choice of law. The principle involved is one of the law merchant common to civilized countries,[3] and hence I shall presume that the law of Cuba is the same on the present issue as that of New York. See De Sairigne v. Gould, Sup.Ct., 3 Misc.2d 452, 148 N.Y.S.2d 57, affirmed, 1st Dept., 1 A. D.2d 820, 150 N.Y.S.2d 780; 9 Wigmore on Evidence § 2536, at page 493 (3rd ed. 1940).

The contracts between C.A.V. and Farr Whitlock called for delivery of the sugar at a specified price free alongside steamer at the Cuban port of Santa

---

1. New York law permits suit without court leave against one who is in receivership and production of any judgment secured thereby in the receivership proceeding. See, e. g., Pringle v. Woolworth, 90 N.Y. 502; Chicago Title & Trust Co. v. Fox Theatres Corp., 2 Cir., 69 F.2d 60, 62, 91 A.L.R. 991.

2. As has already been stated, Farr Whitlock actually made the contracts for the sugar purchase with a wholly-owned subsidiary of C.A.V. but the parties have treated the interests of that subsidiary as identical with the interests of C.A.V.

3. See 2 Williston on Sales § 293 (Revised ed. 1948).

Maria. Payment by Farr Whitlock was to be made in New York, in New York current funds, "on presentation of necessary shipping documents". Clearly, the "necessary shipping documents" included bills of lading. Farr Whitlock therefore could not assert ownership of the sugar against C.A.V. until Farr Whitlock had fulfilled the condition of payment and until such time C.A.V. retained a property interest in the sugar which it could assert against Farr Whitlock. See 2 Williston on Sales § 291, at page 189; §§ 292 and 285 (Revised ed. 1948). Since the language of the decree was sufficiently broad to reach this property interest of C.A.V.,[4] the claim that C.A.V. had no interest in the sugar which could be affected by the decree must be rejected.

I come now to defendants' second claim. Regardless of what the intent of the nationalization decree may have been, I could not give effect to that decree if it purported to affect property interests in sugar which was located outside of Cuba at the time the decree took effect. Vladikavkazsky Ry. v. New York Trust Co., 263 N.Y. 369, 189 N.E. 456, 91 A.L.R. 1426; Restatement, Foreign Relations Law of the United States § 28e (Tent. Draft No. 4, 1960). It is clear, however, that the decree purported to take effect before the ship carrying the sugar departed from Cuba. Defendants contend that the sugar was loaded onto the vessel outside of Cuban territory at a distance of four to six miles off the Cuban port of Santa Maria, which is a subport of the main port of Jucaro, on the southern coast of Cuba. I take judicial notice that the site at which the ship was loaded is inside a well-defined archipelago and that the line of keys forming this archipelago is part of Cuban territory. Given this state of facts, there can be no doubt that the waters between the keys and the mainland where the ship was loaded

are part of Cuban territory. See 1 Moore's Digest of International Law 711, 713, containing statements by the United States Government which recognized these waters as part of Cuban territory when Spain was in possession of Cuba. I must therefore find that the decree purported to affect interests in sugar which was situated within Cuban territory on the decree's effective date.

■ Defendants' third claim is grounded fundamentally on the unenforceability in this forum of Cuba's decree nationalizing property of C.A.V. If in the contemplation of the courts of this country C.A.V. still owned the sugar at the time when the nominee of the Cuban government purported to sell it to Farr Whitlock, plaintiff, as assignee of that nominee, has no right to enforce, as it attempts in this suit, the contract of sale.

■ If the Cuban nationalization decree is not enforceable in the courts of this country plaintiff cannot recover. I may not refuse to enforce the nationalization decree on the ground that it did not comply with the formal requisites imposed by Cuban law, and I therefore must reject Farr Whitlock's contention that there is an issue as to whether the decree was in fact published in the Official Gazette of Cuba, as Cuban law is said to require. See, e. g. Underhill v. Hernandez, 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456; United States ex rel. Von Heymann v. Watkins, 2 Cir., 159 F.2d 650; Restatement, Foreign Relations Law of the United States § 28d(1) (Tent. Draft No. 4, 1960); Note, Acts of State and the Conflict of Laws, 35 N.Y.U.L. Rev. 234, 240–42 (1960); but see Shapleigh v. Mier, 299 U.S. 468, 471–73, 57 S.Ct. 261, 81 L.Ed. 355; Zander, The Act of State Doctrine, 53 Am.J.Int'l L. 826, 845–46 (1959). Nor am I free to refuse enforcement to the nationalization

4. The decree assumed "to order the nationalization, through compulsory expropriation, and, therefore, the adjudication in fee simple to the Cuban State, of all property and enterprises located in the national territory, and the rights and interests resulting from such property and enterprises * * * listed below". Then followed a list of organizations which included C.A.V. The decree also covered all subsidiary enterprises of the named corporations.

decree because it violates the public policy of the forum. E. g., Underhill v. Hernandez, 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456; Oetjen v. Central Leather Co., 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726; Ricaud v. American Metal Co., 246 U.S. 304, 38 S.Ct. 312, 62 L.Ed. 733; Holzer v. Deutsche Reichsbahn-Gesellschaft, 277 N.Y. 474, 14 N.E.2d 798; Luther v. Sagor [1921] 3 K.B. 532.

The crucial question remains, however, whether this court can examine the validity of the Cuban act under international law and refuse recognition to the act if it is in violation of international law. Apparently, no court in this country has passed on the question. See Restatement, Foreign Relations Law of the United States § 28d(2) and comment e. thereto (Tent.Draft No. 4, 1960); Zander, The Act of State Doctrine, 53 Am.J. Int'l L. 826, 843, 845, supra. To be sure, there are dicta in a few cases but they furnish little aid. Contrast, e. g., Shapleigh v. Mier, 299 U.S. 468, 471, 57 S.Ct. 261, 81 L.Ed. 355, with Sulyok v. Penzinteziti, 1st Dep't., 279 App.Div. 528, 535, 111 N.Y.S.2d 75, modified per curiam, 304 N.Y. 704,[5] 107 N.E.2d 604. Foreign forums have evidenced some willingness to examine the validity of foreign acts under international law [6] but by far the strongest support for such examination has come from legal commentators and textwriters.[7] I hold that in the circumstances of the present action the law of the forum will not enforce the Cuban decree if it is violative of international law.

---

5. The issue would have been germane for decision in Ricaud v. American Metal Co., 246 U.S. 304, 38 S.Ct. 312, 62 L.Ed. 733, where property in Mexico of a United States citizen was confiscated by what came to be the recognized Government of Mexico. But the issue was not raised and hence the language of the court foreclosing a reexamination by United States courts of acts of a foreign state within its own territory does not supply an answer to the problem in the present action.

6. See Anglo-Iranian Oil Co., Ltd. v. Jaffrate (The Rose Mary), Supreme Court of Aden, (1953) 1 Weekly Law Reports 246; In re Fried Krupp A. G. [1917] 2 Ch. 188; Republic of Peru v. Dreyfus Brothers & Co., (1888) 38 Ch.D. 348; Wolff v. Oxholm, (1817) 6 M. & S. 92, 105 Eng.Rep. 1177; Czechoslovak Confiscatory Decree Case, (American Zone) Court of Appeals of Nuremberg, Germany, 1949, 1949 Ann.Dig. 19 (No. 10); Confiscation of Property of Sudeten Germans Case, Germany, Amtsgericht of Dingolfing (1948), 1948 Ann.Dig. 24 (No. 12); Anglo-Iranian Oil Co., Ltd. v. S. U. P. O. R. Co., Italy, Civil Court of Rome (1954), 1955 Int'l L.Rep. 23; Anglo-Iranian Oil Co. v. Idemitsu Kosan Kabuski Kaisha, High Court of Tokyo, Japan, 1953 Int'l L.Rep. 305; Domke, Indonesian Nationalization Measures Before Foreign Courts, 54 Am.J.Int'l L. 305 (1960) (discussion of Dutch court decision); but see Anglo-Iranian Oil Co., Ltd. v. S. U. P. O. R. Co., Italy, Court of Venice (1953), 1955 Int'l L.Rep. 19; Domke, op. cit. supra, (discussion of two German judicial decisions on Indonesian nationalization decree).

7. Restatement, Foreign Relations Law of the United States § 28d(2), comment e. and Reporter's note; 1 Oppenheim, International Law 267–70 (8th ed., Lauterpacht, 1955); Fachiri, Recognization of Foreign Laws by Municipal Courts, 12 Brit.Yr.Bk.Int'l L. 95, 102–106 (1931); E. Lauterpacht, Re Helbert Wagg: A Further Comment, 5 Int'l & Comp.L.Q. 301 (1956); Sir H. Lauterpacht, Case & Comment on The Rose Mary, 1954 Camb.L.J. 20; Mann, Sacrosanctity of Foreign Act of State, 54 L.Q. Rev. 42, 54 id. 155 (1943); Mann, 70 Ibid. 181 (1954); Morgenstern, Foreign Acts Contrary to International Law, 4 Int'l L.Q. 326 (1951); Zander, The Act of State Doctrine, 53 Am.J.Int'l L. 826 (1959), supra; Wortley, 33 Grotius Society Transactions 30 (1947); Comment, "Act of State" Doctrine, 58 Mich.L.Rev. 100 (1959); Note, Acts of State and The Conflict of Laws, 35 N.Y.U.L.Rev. 234 (1960), supra; cf. Hyde, Editorial Comment: The Act of State Doctrine and The Rule of Law, 53 Am.J.Int'l L. 635 (1959). Contra, Reeves, Act of State Doctrine and The Rule of Law—A Reply, 54 Am.J.Int'l L. 141 (1960); Lipstein, Case and Comment on The Rose Mary, 1956 Camb.L.J. 138; Seidl-Hohenvelden, Extraterritorial Effects of Confiscations and Expropiations, 49 Mich.L. Rev. 851 (1951).

The doctrine that courts of this country will not examine the validity of an act of a foreign state insofar as it purports to be effective within the territory of the acting state has its source in our conflict of laws principles. The rule is thus a self-imposed restraint. Even if one were to suppose [8] a requirement of international law that a state afford full faith and credit to the acts of another state, such a requirement clearly would not extend to an act of state which was in violation of international law.[9] Probably the basic reason for judicial refusal to examine the validity of acts of foreign states is a wise recognition of and respect for the sovereignty of each state within its own territory, the right of each state to conduct its own internal affairs as it wishes. "We are not so provincial as to say that every solution of a problem is wrong because we deal with it otherwise at home." Loucks v. Standard Oil Co. of New York, 224 N.Y. 99, 111, 120 N.E. 198, 201. The basis for such recognition and respect vanishes, however, when the act of a foreign state violates not what may be our provincial notions of policy but rather the standards imposed by international law.[10] There is an end to the right of national sovereignty when the sovereign's acts impinge on international law. Judicial refusal to inquire into the validity of an act of a foreign state has also been due to a desire not to embarrass the Executive in its conduct of foreign relations. See Bernstein v. Van Heyghen Freres S. A., 2 Cir., 163 F.2d 246, certiorari denied 332 U.S. 772, 68 S.Ct. 88, 92 L.Ed. 357. The United States State Department has, however, delivered a note to the Cuban Government declaring the very nationalization law which plaintiff seeks to enforce to be in violation of international law.[11] It can scarcely be believed therefore that judicial examination of the decree in the light of international law would embarrass the Executive.

In contrast to the dearth of reasons for refusal to examine the validity under international law of the Cuban decree, the reasons supporting such examination seems to me to be compelling. Plaintiff is not a private litigant who may have acted in good faith reliance on the decree but is the financial agent of the Cuban Government and in my view stands in the shoes of that government in seeking to enforce the nationalization measure in the courts of this country. It is only a short step from the last premise to the conclusion that the Cuban Government is seeking directly the aid of this court in implementing its decree. In such circumstances, it would be almost incomprehensible for the forum to implement a foreign violation of international law (assuming arguendo that the decree is so violative) by extending to the forum the operation of this international wrong. Courts of this country have the obligation to respect and enforce international law not only by virtue of this country's status and membership in the community of nations but also be-

---

8. But see Restatement. Foreign Relations Law of the United States § 28c, comment a. (Tent.Draft No. 4, 1960).

9. 1 Oppenheim, International Law 267 (8th ed., Lauterpacht, 1955), supra; Fachiri, Recognition of Foreign Laws by Municipal Courts, 12 Brit.Yr.Bk.Int'l L. 95, 103, supra, ("The obligation to apply public international law overrides the ordinary rules of private international law.").

10. "[T]he attitude implied in the exercise of the power of excluding foreign law which violates international law is itself of significance. It demonstrates that, however great the respect of courts for the official acts of foreign states may be, that respect is limited by the overriding concern for the authority of international law." Morgenstern, Foreign Acts Contrary to International Law, 4 Int'l L.Q. 326, 344 (1951), supra.

11. 43 Department of State Bull. 171 (1960). For notes by the United States Government declaring other recent Cuban nationalization measures to be violative of international law, see 42 Department of State Bull. 153 (1960); 43 id. 141 (1960).

cause international law is a part of the law of the United States, see The Paquete Habana, 175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320; U.S.Const. Art. 1, § 8, cl. 10; 1 Oppenheim, International Law 41–2 (8th ed., Lauterpacht, 1955), supra. The conclusion is inescapable that the decree in the present action is subject to examination in the light of the principles of international law. The effective method to promote adherence to the standards imposed by international law is to enforce these standards in municipal courts, particularly in view of the poverty and inadequacy of international remedies.[12] Such enforcement of the standards imposed by international law will undoubtedly also have the healthy result of enhancing respect for the acts of foreign states which are in conformity with international law.

The question for decision is thus whether the nationalization decree violated international law. Both the decree and the law pursuant to which it was adopted [13] stated candidly that the expropriations were defensive measures against actions by the United States Government to reduce the participation of Cuban sugars in the American sugar market.[14]

12. The principle that a municipal court will not give effect to a foreign law which violates the rules of public international law "is a principle of importance because it provides, in an international society of which the judicial machinery is endowed with only limited and exceptional jurisdiction, one of the few effective remedies by which a person or company, injured by some act which constitutes a violation of international law, can secure at least partial redress by recourse to the judicial machinery of particular states." E. Lauterpacht, Re Helbert Wagg: A Further Comment, 5 Int'l & Comp.L.Q. 301 (1956), supra. Accord: Report of Committee on International Law of the Association of the Bar of the City of New York, A Reconsideration of the Act of State Doctrine in United States Courts 2 (May, 1959).

13. Law 851, Official Gazette of Cuba, July 7, 1960.

14. "Executive Power
"Resolution No. 1.
"Whereas, Law No. 851, of July 6, 1960, published in the Official Gazette of July 7, 1960, authorized the undersigned to provide, through joint resolutions, whenever they * * * deem it advisable in order to defend the national interests, for the nationalization through compulsory expropriation, of the property or enterprises owned by physical and corporate persons who are nationals of the United States of North America, and the enterprises in which such persons have any interest or participation, even though they have been organized under the Cuban laws.
"Whereas, the attitude assumed by the Government and the Legislative Power of the United States of North America,— of continued aggression, for political purposes, against the basic interests of the Cuban economy, as evidenced by the amendment to the Sugar Act adopted by the Congress of said country, whereby exceptional powers were conferred— upon the President of said nation to reduce the participation of Cuban sugars in the sugar market of said country, as a weapon of political action against Cuba, was considered as the fundamental justification of said law.
"Whereas, the Chief Executive of the Government of the—United States of North America, making use of said exceptional powers, and assuming an obvious attitude of economic and—political aggression against our country, has reduced the participation of Cuban sugars in the North American market with the unquestionable design to attack Cuba and its revolutionary process.
"Whereas, this action constitutes a reiteration of the—continued conduct of the government of the United States—of North America, intended to prevent the exercise of its sovereignty and its integral development by our people—thereby serving the base interests of the North American—trusts, which have hindered the growth of our economy and the consolidation of our political freedom.
"Whereas, in the face of such developments the undersigned, being fully conscious of their great historical responsibility and in legitimate defense of the national economy, are duty bound to adopt the measures deemed necessary to—counteract the harm done by the aggression inflicted upon our nation.
"Whereas, according to our constitutional and legal regime, in the exercise of our sovereignty and as a measure of internal legislation, believing that it is advisable, in the face of the consumma-

The Cuban law under which the nationalization decree in issue was enacted was promulgated immediately after Congress amended the Sugar Act of 1948, 61 Stat. 922, 7 U.S.C. § 1100 et seq., to authorize the President to reduce the sugar quota allotted to Cuba for the remainder of 1960 and through March 31, 1961. See Public Law 86–592, July 6, 1960, 74 Stat. 330, 7 U.S.C. § 1158. Secretary of State Christian A. Herter gave the administration's position in support of the measure in hearings before the House Committee on Agriculture.[15] Mr. Herter stated that conferral on the President of the power to reduce the Cuban sugar quota was necessary in the national interest and to insure adequate supplies of sugar. He asserted that Cuba, which had in the past supplied about one-third of the United States' total sugar quota, might not continue to be a dependable supplier of sugar because of her diversification of her economy and the consequent reduction of her sugar acreage and because of her increasing commitments to supply sugar to Communist bloc countries. Because of these and "other circumstances", Mr. Herter declared that "this would be an appropriate time for the United States to seek ways to diversify its sources of supply and reduce the dependence of its consumers on Cuban sugar, the supply of which" might "become increasingly uncertain." [16] A reading of the legislative

tion of the aggressive measures referred to in the foregoing clauses, to exercise the powers—vested in the undersigned by Law No. 851, of July 6, 1960,—i. e., to proceed to the compulsory expropriation in favor—of the Cuban State of property and enterprises owned by—juridical persons that are nationals of the United States of North America, as a decision justified by the necessity of our nation to be indemnified for the harm done to its— economy and to affirm the consolidation of the economic—independence of the country.

> \* \* \* \* \*

"Whereas, the sugar manufacturing companies took possession of the best lands of our country under the protection of the Platt Amendment, an ominous clause designed to permit control of the national economy which facilitated the invasion of—the country by the imperialistic capital of its insatiable and unscrupulous foreign masters who have recovered many—times the value of their investments.

> \* \* \* \* \*

"Resolve:

"First. To order the nationalization, through compulsory—expropriation, and, therefore, the adjudication in fee simple to the Cuban State, of all the property and enterprises located in the national territory, and the rights and interests resulting from the exploitation of such property and enterprises, owned by the juridical persons who are nationals of the United States of North America, or operators of enterprises in which nationals of said country have a pre-dominating interest, as listed below, to wit:

> \* \* \* \* \*

"22. —Companá Azucarera Vertientes Camaguey de Cuba.

> \* \* \* \* \*

"Second. Consequently, the Cuban State is hereby subrogated in the place and stead of the juridical persons listed in the preceding section, in respect of the property, rights and interests aforesaid, and of the assets and liabilities constituting the capital of said enterprises.

"Third. It is hereby declared that these compulsory expropriations are carried out for the reasons of public—necessity and national interest referred to in the introductory clauses of this Resolution.

> \* \* \* \* \*

"Sixth. The managers so designated [for the nationalized enterprises] are hereby further authorized to proceed to the immediate preventive intervention of the juridical persons, enterprises and property which are subsidiary and appurtenant or associated to those constituting the subject of this Resolution; and once such interventions shall have been effected, such steps shall be reported to the undersigned for proper action."

(The foregoing translation was furnished by plaintiff.)

15. Hearings before House Committee on Agriculture, on H.R. 12311, H.R. 12534 and H.R. 12624, 86th Cong.2d Sess., June 22, 1960.

16. Hearings, op. cit. supra note 15, at 5.

history,[17] however, leaves no doubt that the basic reason for the legislation was to impose sanctions on a Government which Congress believed to be unfriendly and to place in the Executive a bargaining tool to obtain a change in the relations of the Cuban State toward this country. The immediate stimulus for the legislation was an impending deficit of domestic areas in filling their sugar quota, a deficit which would, under existing law, have afforded Cuba the option to supply an additional large amount of sugar above her quota to the United States' sugar market.[18]

On the heels of Congressional conferral of the power on the President, the President issued a proclamation sharply reducing the Cuban sugar quota.[19] Several weeks afterward, the nationalization decree in issue was promulgated,[20] containing a recital that the reason for its "compulsory expropriation in favor of the Cuban State of property and enterprises owned by juridical persons that are nationals of the United States" was the aggressive acts of the Congress and the President of the United States in reducing the Cuban sugar quota.

The Cuban law of July 6, 1960, pursuant to which the nationalization decree at issue was enacted, was declared by the United States Government to be violative of international law.[21] The facts and law of the case, irrespective of that determination of the Executive, require the same conclusion by the Judicial with regard to the decree.

Expropriation of C.A.V.'s property was not reasonably related to a public purpose involving the use of such property.[22] The taking of the property was not justified by Cuba on the ground that the state required the property for some legitimate purpose or that transfer of ownership of the property was necessary for the security, defense or social good of the state. The taking was avowedly in retaliation for acts by the Government of the United States,[23] and was totally

17. E. g., Hearings, op. cit. supra note 15; 106 Cong.Record 14679–14681, 86th Cong.2d Sess. (1960).

18. Thus Senator Long, a manager of the bill, stated: "If we do not pass this bill, the probabilities are that we will do what the State Department most fears and what the administration most fears, and that is that the act we have on the books now, with its mandatory provisions, will force the President to accord Castro a major increase this very month that is out of all accord with logic and reason, with our properties and investments being seized down there, and every indication of unfriendliness from the rulers of that country. However, unless we change the law it would accord a major advantage to an unfriendly government." 106 Cong.Record 14680, 86th Cong. 2d Sess. (1960).

19. Proclamation No. 3355, July 7, 1960, 25 F.R. 6414.

20. Executive Power Resolution No. 1, Official Gazette No. 16 (Special Issue) of August 6, 1960, is the manner in which the resolution is cited in a statement in the present action by the Cuban Minister of Foreign Relations, Dr. Carlos Olivares Sanchez.

21. For the text of the note delivered by the United States Ambassador to Cuba to the Cuban Ministry of Foreign Relations protesting the Cuban Nationalization Law of July 6, 1960, see 43 Department of State Bull. 171 (1960).

22. See Anglo-Iranian Oil Co., Ltd. v. S. U. P. O. R. Co., Italy, Civil Court of Rome (1954), 1955 Int'l L.Rep. 23, 42, supra: "[T]he Italian Courts must refuse to apply in Italy any foreign law which decrees an expropriation, not for reasons of public interest but for purely political, persecutory, discriminatory, racial and confiscatory motives."; McNair, The Seizure of Property and Enterprises in Indonesia, 6 Netherlands Int'l L.Rev. 219, 243–47 (1959).

23. Whatever the provocation to Cuba of these acts by the United States Government, the acts were not in violation of international law. To assure an orderly and adequate supply of sugar to this country, the Government had since 1934 restricted the inflow of foreign sugar. For this purpose, certain foreign countries had been favored with the privilege of filling part of the quota assigned by the Government in controlling the market in this country. The privilege involved sales of sugar in this country at prices which were most of the time higher than prices received in the world market, see H.R.Rep. 1746, 86th Cong.2d Sess., at

unconnected with the subsequent use of the property being nationalized. This fact alone is sufficient to render the taking violative of international law.

In addition the present nationalization measure is contrary to the standards of international law because of its discriminatory nature.[24] The act classifies United States nationals separately from all other nationals, and provides no reasonable basis for such a classification. The decree does not justify the classification on the basis of the conduct of the owners in managing and exploiting their properties or on the basis of the importance to the security of the state where ownership of the property resides. The justification is simply reprisal against another government. Doubtless the measures which states may employ in their rivalries are of great variety but they do not include the taking of the property of the nationals of the rival government.[25]

Moreover the nationalization measure in the present action violates international law because it does not provide adequate compensation for the taking of the properties.[26] The decree which expropriated the property of C.A.V. provides no method of compensation, but the law [27] pursuant to which the decree was adopted establishes the method to be applied in the present case. Compensation is to be paid in Cuban Government bonds with a term of not less than 30 years and bearing interest at not less than 2 per cent per annum. There is, however, a provision that annual interest shall be paid exclusively out of a fund to be set up by the National Bank of Cuba to consist of 25 per cent of the foreign exchange received by Cuba each year from sales of sugar to the United States in excess of 3 million Spanish long tons at a price of not less than 5.75 cents per English pound (free alongside). The bonds are to be amortized out of this same fund and the law authorizes the President of Cuba to determine how and to what extent the bonds will be amortized in a period of not less than thirty years. It is thus unclear from the law whether the bonds will be paid at maturity regardless of the size of the fund. The value of the seized property for the purpose of payment is to be determined by appraisers selected by the President and Prime Minister of Cuba. As is evident from the preceding description of

pages 15–16 (Tables 9 and 10), and this privilege could be withdrawn at will.

24. See, e. g., Anglo-Iranian Oil Co., Ltd. v. S. U. P. O. R. Co., Italy, Civil Court of Rome (1954), 1955 Int'l L.Rep. 23, supra; McNair, op. cit. supra note 22, 6 Netherlands Int'l L.Rev. 219, at 247–49; Doman, Postwar Nationalization of Foreign Property in Europe, 48 Colum.L. Rev. 1125, 1130 (1948).

25. See Czechoslovak Confiscatory Decree case, ((American Zone) Court of Appeals of Nuremberg, Germany, 1949), 1949 Ann. Dig. 25 (No. 14) (referring to the principle of international law that "no person can be deprived of his property solely on the ground of his nationality"); Anglo-Iranian Oil Co., Ltd. v. S. U. P. O. R. Co., Italy, Civil Court of Rome (1954), 1955 Int'l L.Rep. 23, 40: "[D]iscriminatory laws, enacted out of hatred, against aliens or against persons of any particular race or category or against persons belonging to specific social or political groups cannot be applied in Italy because they run counter to the initially accepted principle of the equality of individuals before the law.

"Such principles, developed by international doctrine, are generally accepted by the jurisprudence of the various countries."; McNair, op. cit. supra note 22, 6 Netherlands Int'l L.Rev. 219, at 247–49; Domke, Indonesian Nationalization Measures Before Foreign Courts, 54 Am. J.Int'l L. 305 (1960) (discussion of decision of Dutch court).

26. As to the requirement of adequate compensation, see, e. g., 3 Hackworth, Digest of International Law 653–65 (1943); 2 id. 63; 1 id. 21; Harvard Convention on the International Responsibility of States for Injuries to Aliens, Article 10 (Draft No. 11, 1960); McNair, op. cit. supra note 22, at 249–53; 1 Oppenheim, International Law 351–54 (8th ed., Lauterpacht, 1955), supra.

27. Law 851, Official Gazette of July 7, 1960.

the method for compensation, payment of interest on the thirty year bonds is expressly conditioned on United States sugar purchases from Cuba. Indeed, were the sugar quota for Cuba to be restored tomorrow, contributions to the compensation fund, based on the ten year history of sugar purchases from Cuba before the year 1960, would be non-existent.[28] The defects in the scheme are, however, more fundamental. The condition placed on the payment of interest on the bonds, as well as the uncertainty of payment at maturity, render the bonds unmarketable and valueless.[29] Further, the value of the expropriated property is to be determined solely by appraisers appointed by the Cuban Government, an obviously adverse party to the interests of the persons whose property has been seized. Clearly, this is not adequate compensation within the requirements of international law.

Since the Cuban expropriation measure is a patent violation of international law, this court will not enforce it. It follows that C.A.V. owned the sugar which was sold in the present case.

Since plaintiff's motion for summary judgment against defendants Farr Whitlock and the receiver must be denied and there is no issue of fact, summary judgment dismissing the complaint is ordered. Bell v. Waterfront Commission of New York Habor, D.C.S.D.N.Y., 183 F.Supp. 175, affirmed, 2 Cir., 279 F.2d 853.

So ordered.

28. From 1950 through 1959, the monthly average price for raw sugar shipments to this country received by Cuba at no time exceeded 5.50 cents per English pound (free alongside). See Report of Committee on Agriculture on the Sugar Act of 1948, H.R.Rep. 1746, 86th Cong. 2d Sess., at page 16 (Table 10) (1960). Yet contributions to the compensation fund would consist only of 25% of the foreign exchange received by Cuba from sugar sales each year to this country at a price not less than 5.75 cents per English pound (f. a. s.). Furthermore, contributions to the fund would only derive from sugar sales each year to the

United States in excess of 3 million Spanish long tons. Bearing in mind that a Spanish long ton is equivalent to 2,272 English pounds, it appears from the House Report just cited (at page 5, Table 1), that in only one year from 1950 through 1959 did Cuba sell sugar to this country in an amount exceeding 3 million Spanish tons. In only three years from 1934 through 1959 did Cuba sell this country more than 3 million Spanish tons of sugar.

29. See Allison, Cuba's Seizures of American Business, 47 A.B.A.J. 48, 49-50 (1961).