**BANCO NACIONAL de CUBA, Plaintiff,**

**v.**

**The FIRST NATIONAL CITY BANK OF NEW YORK, Defendant.**

**No. 60 Civ. 4664.**

United States District Court
S. D. New York.

July 20, 1967.

Shearman & Sterling, New York City, for defendant; Henry Harfield, Charles C. Parlin, Jr., William Harvey Reeves, New York City, of counsel.

Rabinowitz & Boudin, New York City, for plaintiff; Victor Rabinowitz, Mary M. Kaufman, Henry Winestine, Eleanor Fischer, New York City, of counsel.

## OPINION

FREDERICK van PELT BRYAN, District Judge:

This action by Banco Nacional of Cuba (Banco Nacional), the financial agent of the Government of Cuba, against The First National City Bank of New York (First National City) is one of the numerous cases before me raising issues arising out of confiscations of American-owned property in Cuba by the Castro Government.

The amended complaint alleges two claims for relief, the first for the excess realized by First National City on the sale of collateral held as security for a loan, and the second for deposits by nationalized Cuban banks in First National City in New York. The answer pleads a series of defenses, set-offs and counterclaims based principally on the confiscation of First National City's Cuban branches. First National City has now moved for summary judgment pursuant to Rule 56(a), F.R.C.P., and Banco Nacional has cross-moved for the same relief on the first claim and for judgment dismissing the counterclaims. Rule 56 (b).

I.

The facts giving rise to the first claim for relief are not in serious dispute. On July 8, 1958, First National City, a New York banking corporation doing business in New York and throughout the world, made a loan of fifteen million dollars to Banco de Desarrollo Economicoy Social (Bandes), a governmental corporate agency of the Republic of Cuba. The loan was secured by United States Government bonds and obligations of the International Bank of Reconstruction and Development pledged to First National City by Fondo de Estabilizacion de La Moneda (Fondo), another Cuban governmental agency, and Banco Nacional. On January 1, 1959, the Castro Government took control of the Republic of Cuba. The fifteen million dollar loan to Bandes was renewed for another year on July 8, 1959. Thereafter by virtue of Cuban Law No. 730, February 16, 1960, and Law No. 847, June 30, 1960, Bandes was dissolved and Banco Nacional succeeded to the rights and obligations with which we are concerned in this action, including the obligation to repay the loan. The Republic of Cuba guaranteed repayment. On July 7, 1960, the terms of the loan were renegotiated for the last time. Banco Nacional repaid five million dollars, and requested and obtained an agreement from First National City to defer demand for the balance of ten million dollars for one year. A proportionate amount of collateral was then released.

September 16, 1960, however, marked the date of an irreparable breach of the relationship between these parties. On that day the Cuban militia seized all eleven of First National City's branches located in Cuba. On the following day the issuance of Executive Power Resolution No. 2 left no uncertainty as to the permanent nature of these confiscations; under the terms of the resolution the Cuban State was declared "subrogated" to all of First National City's rights, obligations, and liabilities.[1]

---

1. See note 6, infra.

In the light of this turn of events First National City, on September 23, 1960, sold the collateral it held as security for the unpaid portion of the loan and applied the proceeds in payment of the principal obligation and accrued interest. Defendant concedes—and plaintiff for purposes of this motion does not deny—that the amount realized on the sale of collateral exceeded by $1,810,880.51 the ten million dollars of unpaid principal and the $65,000 interest then due.[2] The first claim for relief seeks judgment for the amount of the excess.

The answer of First National City to the first claim alleges in substance that the Republic of Cuba is the real party in interest in this action, that the Cuban government is indebted to the defendant in an amount exceeding the sum demanded in the amended complaint by reason of the confiscation of its Cuban property, and that therefore the defendant is entitled to set off this outstanding obligation as a complete defense to the claims asserted by Banco Nacional. First National City has also interposed an affirmative counterclaim for the amount of the excess, and seeks dismissal of plaintiff's claim with prejudice. Both parties recognize that this court on the present papers cannot determine the value of First National City's Cuban properties which have been confiscated. But apart from this issue of fact the basic questions in this case are posed by the motions before me.

The ultimate legal issues on the first claim are clearly drawn. Banco Nacional strenuously contends that the affirmative counterclaim and the set-off by way of defense are barred, alternatively, by principles of sovereign immunity and the act of state doctrine. The dispositive question is simply whether defendant is precluded on those grounds from asserting—either affirmatively or by way of set-off as a complete defense—a claim for the value of its confiscated Cuban properties.

## II. *Sovereign Immunity*

■ There is no serious question that the Government of Cuba and Banco Nacional are one and the same for purposes of this litigation.[3] And as a general rule a state which initiates proceedings in a court of another sovereignty waives immunity from a counterclaim or set-off to the extent that it does not exceed the amount of the state's claims. ALI, Restatement (Second), Foreign Relations Law of the United States § 70(2) (a) (1965). This waiver extends to defensive counterclaims which do not arise out

---

2. The amount sought in the first count of the amended complaint was $2,347,000.

3. Plaintiff at various times has argued that defendant's claim against the Cuban government cannot be asserted against Banco Nacional, an entirely separate entity. This position is, of course, flatly inconsistent with the sovereign immunity argument. Moreover, throughout the *Sabbatino* litigation it was recognized by every court concerned that Banco Nacional De Cuba was an instrumentality of the Cuban government. Banco Nacional v. Sabbatino, 193 F.Supp. 375 (S.D.N.Y.1961), aff'd, 307 F.2d 845 (2d Cir. 1962), rev'd, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). As Judge Weinfeld pointed out the complaint there alleged that plaintiff was a "public corporation wholly owned by the government." Banco Nacional De Cuba v. Sabbatino, 27 F.R.D. 255, 258 (S.D.N.Y. 1961). The present amended complaint alleges only that plaintiff "is a corporate body existing under * * * the laws of the Republic of Cuba, authorized to administer the domestic and foreign credit operations of the Republic of Cuba as its agent and having its principal office in Havana, Cuba." But any doubts as to the organic relationship between plaintiff and the Cuban government are removed by an examination of the local laws defining the function and authority of Banco Nacional. Plaintiff alone has exclusive charge of directing the banking function of the state. Law No. 891, arts. 1, 2, 3, Oct. 14, 1960. And it is plaintiff who shall exercise "the monetary sovereignty of the Nation." Law No. 930, art. 1, Feb. 23, 1961. The Government of Cuba and Banco Nacional are indistinguishable entities for purposes of this lawsuit. Compare Dexter & Carpenter, Inc. v. Kunglig Jarnvagsstyrelsen, 43 F. 2d 705 (2d Cir. 1930).

of the subject matter of the claims of the state which initiated the action. National City Bank of New York v. Republic of China, 348 U.S. 356, 75 S.Ct. 423, 99 L.Ed. 389 (1955); Wacker v. Bisson, 348 F.2d 602, 610 (5th Cir. 1965); American Hawaiian Ventures, Inc. v. M. V. J. Latuharhary, 257 F.Supp. 622, 626–627 (D.N.J.1966); see Dexter & Carpenter, Inc. v. Kunglig Jarnvagsstyrelsen, 43 F.2d 705 (2d Cir. 1930). The ultimate policy reason for this is simply that "fairness has been thought to require that when the sovereign seeks recovery, it be subject to legitimate counterclaims against it." Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 438, 84 S.Ct. 923, 945, 11 L.Ed.2d 804 (1964); see Pugh & McLaughlin, Jurisdictional Immunities of Foreign States, 41 N.Y. U.L.Rev. 25, 53–54 (1966).

■ So viewed, there is no doubt that the assertion of First National City's defensive counterclaim as a set-off is not barred because plaintiff happens to be an instrumentality of the Cuban government. When a foreign government institutes suit in the courts of this country, it can expect nothing more and nothing less than substantial justice between the parties. Since the decision in National City Bank of New York v. Republic of China a suit brought by a foreign government is no longer a one-way street. The doctrine of sovereign immunity cannot be raised in this court as a technical bar to any legitimate defensive counterclaims or set-offs advanced by First National City.[4] Whether the defendant has such legitimate defenses—and if so in what amount— are, of course, entirely separate questions.[5]

### III. *The Act of State Doctrine.*

■ The basis for defendant's set-off is that the Government of Cuba, in whose shoes Banco Nacional stands, confiscated eleven of First National City's Cuban branches without compensation and in violation of international law. Under Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), inquiry into the legality *vel non* of the expropriations here involved would be foreclosed by the act of state doctrine which forbids the courts of one country from sitting "in judgment on the acts of the government of another, done within its own territory." 376 U.S. at 416, 84 S.Ct. at 934, quoting Underhill v. Hernandez, 168 U.S. 250, 252, 18 S.Ct. 83, 42 L.Ed. 456 (1897). However, the holding in *Sabbatino* was for all practical purposes overruled by the Hickenlooper amendment to the Foreign Assistance Act of 1964, 22 U.S.C. § 2370 (e) (2), as amended, 79 Stat. 658–659 (Sept. 6, 1965), the constitutionality of which has been upheld. Banco Nacional de Cuba v. Farr, 243 F.Supp. 957 (S.D. N.Y.1965), aff'd, July 31, 1967 (2d Cir.). Congress there declared that the courts of this country should not refrain, on the ground of the act of state doctrine, from determining the merits in cases involving a confiscation after January 1, 1959, by an act of a foreign state "in violation of the principles of international law, including the principles of compensation." The Hickenlooper Amendment specifically stated that it did not apply "in any case in which an act of a foreign state is not contrary to international law".

The ultimate act of state doctrine issue boils down to whether the confisca-

---

4. Pons v. Republic of Cuba, 111 U.S.App. D.C. 141, 294 F.2d 925 (1961), cert. den., 368 U.S. 960, 82 S.Ct. 406, 7 L.Ed.2d 392 (1962), is not to the contrary because the party there aggrieved by the Cuban confiscation was a Cuban national,

5. As mentioned, First National City has also interposed an affirmative counterclaim to recover the amount by which the

compensation for the confiscations exceeds the $1,810,880.51 figure. I hold, however, that plaintiff's limited waiver of immunity by instituting this suit permits only the assertion of a defensive counterclaim that "does not exceed the amount of the state's claims." Restatement (Second), Foreign Relations Law of the United States § 70(2) (a) (1965).

tions of First National City's Cuban property violated principles of international law. In my view the seizures here involved had precisely this effect for a combination of reasons.

In the first place the various decrees authorizing the confiscations did not provide for adequate payments to First National City. The scheme of "illusory compensation" outlined by Judge Waterman in *Sabbatino*, 307 F.2d at 862, has been totally ineffective in practice in the intervening years. No compensation whatsoever appears to have been forthcoming and none can reasonably be expected in the foreseeable future.

It is true that both the Second Circuit and the Supreme Court in *Sabbatino* pointedly refrained from resolving the delicate question of whether the mere failure, without more, to provide adequate compensation to aliens whose property has been expropriated constitutes a breach of international law. 376 U.S. at 428–430, 84 S.Ct. 923; 307 F.2d at 862–864. But Congressional passage of the Hickenlooper Amendment has removed any doubt on this score—at least insofar as the courts of this country are concerned. While the reference to the "principles of compensation" in 22 U.S.C. § 2370(e) (2) is somewhat open-ended because it does not state specifically that compensation is a *sine qua non* of full compliance with international law, subsection (1) of the same statute leaves no doubt as to the views of Congress on the subject. That provision requires the suspension of assistance under the foreign aid program to the government of any state which, after effectuating the confiscation of property that is at least 50 per cent owned by United States citizens or corporations, "fails within a reasonable time * * * to take appropriate steps * * * to discharge its obligations under international law toward such citizen or entity, including speedy compensation for such property in convertible foreign exchange, equivalent to the full value thereof, as required by international law". The legislative history of the Hickenlooper amendment

and its extensions is replete with statements reaffirming what is plain on the face of the legislation, i. e., that international law, at least from the parochial point of view of the United States, requires full compensation for seizures of American-owned property. S.Rep.No. 170, 89th Cong., 1st Sess. at 19; 110 Cong.Rec. 18936–37, 18946 (Aug. 14, 1964); 110 Cong.Rec.App. A5157 (daily ed. Oct. 7, 1964) (Senator Hickenlooper's Statement on Conference Report); see 22 U.S.C. § 2370(a) (2). ·

■■ It is clear to me that this rule of compensation legislatively announced by Congress is fully consistent with generally accepted principles of international law established by the authorities reviewed by the appellate courts in *Sabbatino*. It is therefore unnecessary to reiterate the settled proposition that "the rules of international law * * * are subject to the express acts of Congress." United States ex rel. Pfefer v. Bell, 248 F. 992 995 (E.D.N.Y.1918). This court would accordingly be bound to apply the provisions of the Hickenlooper amendment even if they were found to be inconsistent with the views of other nations on international law, though that is not so here. See The Nereide, 13 U.S. (9 Cranch) 388, 423, 3 L.Ed. 769 (1815); Paquette Habana, 175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320 (1900); United States v. Siem, 299 F. 582, 583 (9th Cir. 1924); Schroeder v. Bissell, 5 F.2d 838 (D.Conn.1925); Reeves, The Sabbatino Case and the Sabbatino Amendment: Comedy—or Tragedy of Errors, 20 Vand.L.Rev. 429, 492–93 (1967).

There is more to this case, however, than a naked failure by the Cuban government to comply with general principles of compensation. Violations of international law spring from other sources also. The September 16, 1960, takeover of First National City's branch banks in Cuba had all the earmarks of the seizure of American-owned properties which Judge Waterman in *Sabbatino* condemned as violative of international law for reasons apart from the failure to provide compensation. Here,

as in *Sabbatino*, the expropriations were consummated under Cuban Law' No. 851, July 6, 1960, which granted the government *carte blanche* authority to confiscate all properties owned by nationals of the United States. As Judge Waterman pointed out, see 307 F.2d at 865 n. 14, this law plainly was passed as a retaliatory measure against the United States Government's reduction of the sugar quota allotted to Cuba. On September 17, 1960, the day after the Cuban militia seized defendant's branches, the Cuban government issued Executive Power Resolution No. 2, which, like Resolution No. 1 involved in *Sabbatino*, justified the seizures of American-owned property as retaliation for an "act of cowardly and criminal aggression," that is, the reduction of the sugar quota.[6]

6. The vitriolic language of Resolution No. 2, Def. Ex. 22, left no doubt as to the retaliatory and discriminatory motivation for the bank seizures:

"Whereas: Law No. 851 of July 6, 1960, published in the *Gaceta Oficial* of July 7, authorized the undersigned to order jointly, whenever they consider it necessary to the defense of the national interest, the nationalization, by means of expropriation, of the assets and companies owned by natural or juristic persons who are nationals of the United States of America, or of companies in which the said persons have an interest or participation, even though the said companies were constituted in accordance with Cuban laws.

Whereas: It is not possible to allow a large share of the nation's banking to remain in the hands of the imperialist interests which, in an act of cowardly and criminal aggression, inspired the reduction of our sugar quota.

Whereas: Subsequent to the reduction of the sugar quota, the Government of the United States of America and the representatives of monopolistic interest of that country repeatedly committed acts of open aggression against the Cuban economy, such as those involving the curtailment of trade between the two countries, which had the obvious purpose of hampering the economic development of Cuba; and the imposition of embargoes on commercial aircraft owned by Cuban companies, under the legal guise of claims against civil debts, but which have the implicit purpose of curtailing our vital means of international communication, in an increasingly greater effort to isolate our country.

Whereas: One of the most efficient instruments of that imperialistic interference in our historical development has been typified by the operations of the American commercial banks, which have served as a financial vehicle to facilitate the monopolistic activities of the American companies in Cuba and the massive invasion of our country by imperialistic capital through usurious loans, which, far from promoting our economic growth, brought about in times of emergency numerous lawsuits resulting in the siezure of our national wealth by that imperialistic capital.

Whereas: It has always been the financial policy of these banks to encourage the activities of the American companies that devote their efforts to the procurement of our natural resources, the exploitation of our land by holders of large estates, and the mercantile operations that have contributed to the growing trend toward importing American manufactured goods, to the extent that it has hindered the development of national industries and has forced our economy to become dependent on a single crop and a single export.

Whereas: All this proves that the activities of American banks in Cuba have been a decisive factor in the disruption of our economic structure.

Whereas: It is unquestionable that the continuation of American banking interests in Cuba, a typical example of the imperialistic phenomenon, constitutes an obstacle to national liberation.

Whereas: In addition to the facts already stated, there is the deliberate practice of the United States Government designed to facilitate and to encourage, within its own territory, counter-revolutionary activities by war criminals and fugitive traitors.

Whereas: Furthermore, the work of international espionage in Cuban territory has been intensified under the sponsorship of that Government, with notorious contempt for international law and with the obvious intention of promoting conspiratorial activities in our country.

Whereas: All these acts are undertaken for the purpose of destroying the great achievements of the Cuban Revolution, in the wicked hope of again subjecting our country to imperialistic oppression.

Whereas: We the undersigned realize that we should exercise the authority vested in us, and that we should proceed, in responsible discharge of the revolu-

"[C]onfiscation without compensation when the expropriation is an act of reprisal does not have significant support among disinterested international law commentators from any country." 307 F.2d at 866. Thus the allegations in the decrees that the general public interest necessitated the seizures of First National City's property must be discounted when the manifest purpose of the confiscations was political retaliation of the rankest sort.

Moreover, as in *Sabbatino,* the reprisals involved in this case evidently evince discrimination rising to the level of a violation of international law. Not only was Law No. 851 aimed solely at United States Nationals, but also a general confiscation of the remaining Cuban banking properties did not take place until October 14, 1960,[7] almost a month after First National City's branches were seized. Even then the end result was not that Cuban-owned enterprises and American-owned enterprises were treated alike, compare 307 F.2d at 845, because the compensation provisions for Americans, unlike those for Cuban citizens, were entirely dependent upon the creation of a fictitious fund consisting of "twenty-five per cent of the foreign exchange received by Cuba from its annual sales to the United States of Cuban sugar in excess of three million Spanish long tons at a price of not less than 5.75 cents per English pound (f. a. s.)." 307 F.2d at 862. Beyond this, First National City obviously was damaged by discrimination to the extent it did not enjoy the profitable use of its Cuban properties during the period non-American bank enterprises operated unmolested.

## IV.

◼ The totality of circumstances presented by this case—a patent failure to provide adequate compensation, a retaliatory confiscation by a foreign government, and discrimination against United States nationals—compel a finding that the Cuban decree directing confiscation of First National City's property was in direct contravention of the principles of international law. Thus First National City is entitled to set-off against the first claim for relief such amount as may be due and owing to it from the Cuban Government as compensation for the seized Cuban properties, and I so hold.[8]

Banco Nacional is quite correct in pointing out that the amount owing to

---

tionary duty, to nationalize all the American banks operating in our country, thus advancing still further on the road undertaken by our people, with firm patriotic will, toward the total economic independence of our nation.

Now, therefore: Exercising the authority vested in us, in accordance with the provisions of Law No. 851 of July 6, 1960,

We Resolve:

First: To order the nationalization, by expropriation, and consequently, award to the Cuban Government, in absolute ownership, all the assets, rights and shares deriving from the utilization thereof, especially the banks, including all their branches and agencies located in Cuba, which are the property of the following legal persons:

1. The First National City Bank of New York
2. The First National Bank of Boston
3. The Chase Manhattan Bank

Second: Accordingly, the Cuban State is hereby declared subrogated in the place and stead of the natural or juristic persons listed in the preceding paragraph with respect to the above mentioned property, rights, and rights of action, and to the assets and liabilities forming the capital of the above mentioned companies."

\*     \*     \*     \*     \*

7. Law No. 891, Def. Ex. 10.

8. The *Sabbatino* amendment is inapplicable "in any case with respect to which the President determines that application of the act of state doctrine is required in that particular case by the foreign policy interests of the United States and a suggestion to this effect is filed on his behalf in that case with the court." 22 U.S.C. § 2370(e) (2). However, since the Executive Branch has maintained silence for the six years this action has been pending, it is clear that it has not determined that foreign policy interests of the United States require application of the act of state doctrine here.

First National City from the Government of Cuba under the applicable international law "principles of compensation" [9] cannot be determined on this record. The actual amount of the set-off which can be asserted here poses delicate questions of fact and law requiring further careful consideration. See *Reeves*, supra at 505–508, for a consideration of some of the factors involved. It therefore cannot be determined on these motions whether, as defendant contends, the amount of the set-off equals or exceeds the sum of $1,-810,880.51 admittedly owing to the plaintiff. If it does, defendant is entitled to judgment dismissing count one.[10]

## V.

The second claim for relief may be speedily disposed of. It alleges that a number of Cuban banks which were nationalized pursuant to Law No. 891 in October, 1960, at that time maintained accounts with the defendant at its office in New York City. Banco Nacional as agent of the Cuban Government now lays claim to these funds, amounting to some $33,812.93, by virtue of the confiscation decree declaring it to have full title to the property of the Cuban banks who maintained these accounts in New York.

■■ The short answer to this claim is simply that "when property confiscated is within the United States at the time of the attempted confiscation, our courts will give effect to acts of state 'only if they are consistent with the policy and law of the United States.'" Republic of Iraq v. First National City Bank, 353 F.2d 47, 51 (2d Cir. 1965), cert. den., 382 U.S. 1027, 86 S.Ct. 648, 15 L.Ed.2d 540 (1966), quoting ALI, Restatement of Foreign Relations Law § 46 (Proposed Official Draft, 1962). The Cuban decree, like the attempted confiscation of the accounts in *Republic of Iraq*, is plainly contrary to our policy and laws. It is

not entitled to extraterritorial enforcement in United States courts as to property located within the United States. Republic of Iraq v. First National City Bank, supra; see F. Palicio y Compania v. Brush, 256 F.Supp. 481 (S.D.N.Y. 1966), aff'd per curiam, 375 F.2d 1011 (2d Cir. 1967); see Note, International Conflict of Laws: Limitations Imposed On Effect American Courts May Give Foreign Confiscations, 1966 Duke L.J. 828. Defendant is therefore entitled to judgment dismissing count two.

## VI.

In the light of what has been already said the motions before me are disposed of as follows:

(1) Defendant's motion for summary judgment on the second claim for relief is granted. Since I find there is no just reason for delay, it is directed that final judgment in favor of defendant will be entered accordingly. Rule 54(b), F.R.C.P.

(2) Plaintiff's cross-motion for summary judgment on its first claim and on the counterclaims is in all respects denied.

(3) Defendant's motion for summary judgment on the first claim is denied since there are triable issues of fact and law with respect to the amount of defendant's set-off. However, I hold that defendant is entitled to set-off as against the first claim for relief any amounts due and owing to it from the Cuban Government by reason of the confiscation of First National City's Cuban properties.

This opinion shall constitute my specification of the facts supporting that holding pursuant to Rule 56(d), F.R.C.P. The case will be tried on the sole issue of the amount which defendant is entitled to assert by way of set-off.

It is so ordered.

---

9. 22 U.S.C. § 2370(e).

10. Any sum which First National City is permitted to set-off in this action will, of course, have to be taken into account by the United States Foreign Claims Settlement Commission in assessing claims filed by First National City. See International Claims Settlement Act, § 501, 78 Stat. 1110 (1964), 22 U.S.C. § 1643.