Keating, J. (dissenting).
I am in agreement with Judge Burke that the evidence does not establish that Decision No. 346 was applicable to plaintiff’s certificates because of their unique character. But even if these certificates were within the ambit of Decision No. 346, it seems unalterably established that the act of state defense is inapplicable because what is involved here is no mere ‘ ‘ breach of contract ’ ’, but a confiscation clothed in the disguise of a valid currency regulation.
Whatever may be said of the interpretation in the majority opinion of the Hickenlooper-Sparkman Amendment and the approval of a confiscation in violation of international law, the view that the right to receive $150,000 is something other than “ property ” and the dismissal of the evaporation of plaintiff’s money simply as a “ serious loss ” is difficult to comprehend.
There is a strong element of irony in the majority’s approach. The first half of the opinion dwells on the need to avoid any judicial intrusion into the prerogatives of the President and the Congress in the area of international relations. There can be no possible quarrel with this argument. In the second half, this principle, however, is then used to thwart the will of a Congress which regarded the fears expressed by the Supreme Court in Sabbatino (Banco Nacional de Cuba. Sabbatino, 376 U. S. 398), as unjustified, if not groundless, and, therefore, sought to overrule Sabbatino and to demand that, absent an expressed indication by the President to the contrary, the courts should “ make a determination on the merits ” where an act of state defense is raised. We should strive to give full and fair effect to the congressional design. Because Congress’ adoption of the Hickenlooper Amendment was considered unwise by many is no justification to rely on Sabbatino as if Hickenlooper—whatever it covers—had never been passed (see pp. 53-57 of the majority opinion).
*77 Why the word “ property ” in the Hickenlooper Amendment should not include contractual rights remains a complete mystery. Nowhere does the majority explain what social policy is of such grave importance that plaintiff must be deprived of her just judgment to further that policy.
Also, I cannot endorse a view which treats Decision No. 346 as legitimate under international law when it is nothing other than an act of confiscation. “ [M]ost of all I would not declare that if ever there were a clear consensus in the international community, the courts must close their eyes to a lawless act and validate the transgression by rendering judgment for the foreign state at its own request * * * I cannot so cavalierly ignore the obligation of a court to dispense justice to the litigants before it.” (Banco Nacional de Cuba v. Sabbatino, 376 U. S. 398, 456, supra [Justice White’s dissent].)
Nor can I endorse a result which both consigns the plaintiff to nonexistent remedies she might obtain through the intervention of the Federal Government and which asks us to complete the process of confiscation commenced a decade ago by the Castro Government.
I.
Before proceeding to outline my approach to the questions raised here, I feel compelled to analyze some of the techniques by which the majority reaches the conclusion that the Hickenlooper Amendment is inapplicable here.
The majority opinion defines the scope of the Hickenlooper Amendment in one of two ways. It encompasses situations “ exemplified by the Sabbatino case itself ” (p. 58) where confiscated property is brought to the United States and the original owner seeks to assert his rights to the property (see, also, p. 61). The alternative position is that it covers “ a claim to the very property which has been confiscated.” This definition, if literally read, is applicable here, except that the majority has excluded “contractual rights ” from its definition of property. The ambiguity in the majority’s definition of “ property ” results from the fact, as we shall see, that either definition alone creates impossible problems of statutory construction.
1. The majority opens its discussion of the Hickenlooper Amendment with a brief quote from the statute in which the *78 words upon which the majority rely—“ claim of title or other right to property ”—are italicized. This is preceded by a brief quotation from the Senate Foreign Relations Committee Report on the Hickenlooper Amendment to the effect that the statute was enacted to 1 ‘ reverse in part” the decision in S abb atino (S. Rep. No. 1188, Pt. I, 88th Cong., 2d Sess., p. 24 [1964]). One might assume that, if this reference to the Senate Report is examined, one would find there a statement supporting the majority’s interpretation of the reach of the Hickenlooper Amendment. Such is not the case, however. The bill the Senate was reporting out of committee did not even contain the phrase “ claim of title or other right to property”. That phrase did not come into the statute until much later in the legislative process.[1] The full context in which the statement appears is most instructive and presents quite a different picture from that suggested by the majority (see post, p. 84).
2. Next, the majority argues that “ In the strictest sense, and within the terms of the [Hickenlooper Amendment], just as no one has 1 taken ’ the pesos from Ritter, so no one has ‘ taken ’ the contract from him” (p. 59). If the majority means that the pesos or the certificates have not been physically taken from Ritter’s possession, no one will dispute this. Since when, however, must there be a physical taking for there to be a “ confiscation”? Likewise the majority’s argument that a breach of contract by a foreign state cannot constitute a confiscation is surely incorrect. (Sulyok v. Penzintezeti Kozpont Budapest, 279 App. Div. 528, mod. on other grounds 304 N. Y. 704; see, also, Matter of Wa-Wa-Yanda v. Dickerson, 18 A D 2d 251.) The majority’s strict definition of taking could never have been intended by the Congress since such a limited definition of confiscation is unknown in our law (Perry v. United States, 294 U. S. 330 [holding unconstitutional the repudiation of the Gold Clause insofar as it affected obligations of the United States Government]). Nor does it exist in international law (Restatement, 2d, Foreign Relations Law of the United States, §§ 192, 195).
When a zoning law has been held unconstitutional as confiscatory, there is never an actual taking (Arverne Bay Constr. Co. v. Thatcher, 278 N. Y. 222). The zoning analogy here is perfect.
*79 The police power may not be used to deprive a property owner of all enjoyment of his property. Likewise, .the need to preserve a country’s international economic position does not permit the destruction of all benefits of contractual rights without limit.
3. In its discussion of Banco Nacional de Cuba v. First Nat. City Bank of N. Y. (270 F. Supp. 1004) the difficulties in the majority’s definition of “ property ” become manifest. First of all, the money which was the res of the lawsuit was not expropriated property. Thus, the first definition of “ property ” offered by the majority fails. Secondly, the confiscation decree in First Nat. City Bank involved the taking of contractual rights, precisely contrary to the majority’s position here (see supra, pp. ,1009-1010, n. 6).
We could go on to point out the other similar errors in the majority’s analysis, but it would be a pointless exercise. The most grievous error is that it completely fails to give one reason why it finds it so absolutely necessary to interpret the statute so as to exclude “contractual rights ”, It certainly is not required by the statutory language nor policy. A natural reading of the amendment, giving every word its normal value, would certainly result in its application here.
n.
Immediately after the Supreme Court’s decision in Sabbatino, an amendment to the Foreign Assistance Act of 1961 was cosponsored by Senators Hickenlooper and Sparkman. It sought to reverse the effect of the Supreme Court’s Sabbatino decision. Strong opposition to the proposal was immediately expressed by the Department of State. (See Hearings of Senate Committee on Foreign Delations on Foreign Assistance Act of 1964, pp. 618-619.)
The State Department pointed out that, under the terms of the proposal, unless the President interposed an objection, the courts would be required to pass on the validity under international law of an act of a foreign state within its own borders. This, said the department, would greatly embarrass the President in his conduct of the nation’s foreign affairs because his decision to or not to intervene would subject him .to a charge of discrimination by United States nationals or the foreign govern *80 ments involved. Also, important foreign policy considerations could be adversely affected by the happenstance of private litigation.
Other critics of the proposal and of the amendment later adopted have argued vigorously that the proposal was based upon a misunderstanding of the act of state doctrine and upon the erroneous belief that the Supreme Court had gone far beyond any foreign decision in expanding the scope of the doctrine. (See Beeves, The Sabbatino Case and the Sabbatino Amendment: Comedy—or Tragedy—of Errors, 20 Yand. L. Bev. 429 [1967].) There were, however, many eminent scholars who supported the proposal, believing that Senators Hickenlooper and Sparkman’s proposal was sound in principle and would advance the “ rule of law ” in international affairs (see 110 Cong. Becord 19548 [1964]).
Whatever the merits of the controversy, Congress rejected the view of the State Department, the Hickenlooper Amendment was adopted and its constitutionality sustained (Banco Nacional de Cuba v. Farr, 243 P. Supp. 957 [S. D. N. Y., 1965], affd. 383 P. 2d 166 [2d Cir. 1967], cert. den. 390 U. S. 956 [1968]).
At the outset, it is readily apparent that the statute is inexpertly drafted. Nevertheless, we are required to interpret the statute in a manner which is both sensible and consistent with the policy expressed in the amendment’s language and its legislative history. The majority proposes to do complete violence to the intent of Congress.
In its original form, Senator Hickenlooper’s proposal provided that it covered a case in which “ an act of a foreign state occurring after January 1, 1959 is alleged to be contrary to international law ”.
Had this proposal been enacted, there would be no question that the act of state defense could not be invoked here.
The. Congress, however, was troubled by certain practical problems created by the broad language of the initial proposal. When the problems were brought to its attention, it set out to correct them but in doing so, it created other difficulties in interpretation. But at no time did the Congress intend to limit the effect of the statute to the cases where the confiscating state *81 itself seeks to gain or retain control over property it had previously confiscated. The particular language of the amendment which became law was a result of Congress’ desire to protect innocent third parties—which is not the case here. (See 110 Cong. Record 19557, Ques. 6.)
Senator Hickenlooper’s original proposal was tacked onto the House-passed Foreign Assistance Act of 1964 (H. R. 11380), and was reported out of the Senate Committee on Foreign Relations on July 10, 1964 (S. Rep. 1188, p. 24). The Senate Report contained the following statement (U. S. Code Cong, and Adm. News, 1964, p. 3852):
“ The amendment is intended to reverse in part the recent decision of the Supreme Court in Banco Nacional de Cuba v. Sabbatino, D. C. N. Y., 193 F. Supp. 375. The act-of-state doctrine has been applied by U. S. courts to determine that the actions of a foreign sovereign cannot be challenged in private litigation. The' Supreme Court extended this doctrine in the Sabbatino decision so as to preclude U. S. courts from inquiring into acts of foreign states, even though these acts had been denounced by the State Department as contrary to international law.
# # *
“ The effect of the amendment is to achieve a reversal of presumptions. Under the Sabbatino decision, the courts would presume that any adjudication as to the lawfulness under international law of the act of a foreign state would embarrass the conduct of foreign policy unless the President says it would not. Under the amendment, the Court would presume that it may proceed with an adjudication on the merits unless the President states officially that such an adjudication in the particular case would embarrass the conduct of foreign policy.”
Thus, when the Senate Committee stated the proposal was intended “to reverse in part” Sabbatino, it was referring to its intent to overrule the Supreme Court where the act of state is alleged to have violated international law. In those cases, the Senate Report clearly indicates a purpose that the courts declare the act unlawful if it violates international law and give effect to that declaration of illegality. Only where the President *82 explicitly states that an ‘ ‘ adjudication on the merits” would embarrass his conduct of foreign pplicy should the courts refrain from inquiring into the acts of foreign states.
Up to this point, therefore, there is no question that, in a case such as the one at bar, we would be required under the original proposal to determine whether Decision No. 346 violates international law and, if it does, to give no effect to the act of state defense here. This at a minimum is what Congress intended.
The question immediately arises whether the subsequent history of the proposal and the change in language was intended to change this result. After H. R. 11380 passed the Senate on September 24,1964, a Senate-House conference was held to iron out differences between the two versions of the bill. In conference, changes were made in the language of the original Hickenlooper proposal, which became law. The Conference Report sets forth the purposes of the change in the following language (H.R. Rep. No. 1925, 88th Cong., 2d Sess., p. 16 [1964]):
“ AMENDMENT NO. 39 : EXPBOPBIATIONS BY EOEEIGN STATES
“ The Senate amendment added a new paragraph (2) to subsection 620(e) of the act, providing that no U. S. court shall refuse, on the ground of the ‘ act of state ’ doctrine, to examine the validity of acts of foreign states occurring after January 1, 1959, which are alleged to be contrary to international law, unless the President determines and notifies the court that application of the ‘ act of state ’ doctrine is required by U. S. foreign policy interests.
“ The House bill did not contain a comparable provision.
“ The House recedes with an amendment.
“ The managers on the part of the House regretted that there had not been an opportunity for thorough study and full hearings on the subject. The committee of conference amended the Senate language to pinpoint its precise effect, making it clear that it does not apply if no violation of international law principles is found, or if the case involves a short term irrevocable letter of credit issued in good faith prior to the taking of property by a foreign state. ’ ’ (Italics supplied.)
The purpose of the second change, therefore, was to protect innocent third parties. What troubled the Congress was a pos *83 sible suit brought against an innocent third party who seeks to raise the act of state defense to avoid suffering an unjust loss. That this is what concerned Congress is confirmed by the Congressional Record (110 Cong. Bee. 19557, Ques. 6) and by the later 1965 amendments. Thus, nothing in the Conference Beport can justify the conclusion that we should not apply principles of international law here where we have the wrongdoer or its agent before our courts.
The particular concern of Congress, of course, was that the United States should not become a “ thieves market ” for confiscated or expropriated property (110 Cong. Bee. 19548).[2] But there was also broader motivation which was a strong desire to give added protection to American citizens from expropriation without compensation by seeking to nullify wherever possible the effects of such expropriation. Finally, there was the thought that the amendment would strengthen the development of international law. For this reason, the amendment was often referred to as the ' ‘ rule of law ” amendment.
In general, the congressional design was to overrule Sabbatino in accordance with Justice White’s view that the act of state doctrine, should not apply where there has been a violation of international law (Bleicher, The Sabbatino Amendment in Court: Bitter Fruit, 20 Stan. L. Bev. 858 [1968]). This can be seen from the debates in the Senate on the Hickenlooper Amendment (110 Cong. Bee. 19546-19560; 23674-23682). Justice White’s dissent is recorded in the Congressional Becord in full (110 Cong. Bee. 19548-19554). It is evident from the repeated references to it that the Congress was adopting Justice White’s views.
In 1965 the Committee on Foreign Belations of the House of Bepresentatives held hearings on the amendment which was scheduled to expire on January 1,1966. The Committee’s Beport contains the following statement indicating its understanding of the effect of the amendment (Beport on Foreign Affairs on H. B. 7750; H. B. Bep. No. 321, 89th Cong., 1st Sess., p. 31 [1965]):
*84 “Section 301(c)(2) amends section 620(e)(2) of the act which relates to the application of the Federal act of state doctrine by extending for an additional year the provisions of a Senate amendment added to the Foreign Assistance Act of 1964, which provide that no U. S. court shall refuse, on the ground of the act of state doctrine, to examine the validity of acts of foreign states occurring after January 1,1959, which are alleged to be contrary to international law, unless the President determines and notifies the court that application of the act of state docrine is required by TI. S. foreign policy interests.”
Again, there is not a hint that the court will examine the validity of foreign acts only where the expropriated property comes to our shores or that it applies only to specific property as distinguished from contractual rights.
During that session, the amendment was made permanent. The second change is described in the Senate Report as follows (S. Rep. No. 170, 89th Cong., 1st Sess., p. 19 [1965]):
“ The existing law appEes to cases pending at the time of its enactment or brought since then in which ‘ a claim of title or other right ’ is asserted based upon a confiscation or other taking after January 1, 1959, by an act of a foreign state in violation of the principles of international law. The biE amends this so that it will apply only to cases in which ‘ a claim of title or other right to property ’ is asserted. The same change is made in the proviso in existing law which exempts cases with respect to such claims acquired pursuant to an irrevocable letter of credit of not more than 180 days issued in good faith prior to the time of the confiscation.
“ The words ‘ to property ’ have been inserted to make it clear that the law does not prevent banks, insurance companies, and other financial institutions from using the act of state doctrine as a defense to multiple liability upon any contract or deposit or insurance policy in any case where such liability has been taken over or expropriated by a foreign state. In such cases, it is not intended to affect any defense previously available to such institutions.”
Congress thus contemplated lawsuits in which third parties might assert claims against banks, insurance companies and other financial institutions. If no effect at all were given to *85 act of state defenses, there would be a strong possibility of multiple liability. The explicit desire was to protect persons from this hazard. There is no such possibility here since the defendant here is an arm of the Cuban Government.
According to the majority, if Cuba were now to sue in our courts to enforce a contractual right which it had taken over through an act of expropriation, we would be required to enforce that act of confiscation. If this is an accurate statement of the net effect of Congress’ attempt to legislate in this area, and if indeed Hickenlooper has the narrow scope which the majority claim, the Congress has surely labored in vain.
The only fair reading of the amendment and the only one which will give effect to the clear intent of Congress, however inarticulately expressed, is to construe the key phrase “ right to property ” broadly to include any property of the confiscating state now in the control or possession of our courts. The majority state that it was the manifest intent of Congress to exclude 11 all” contract claims when it added the words “ to property”. Nowhere in the entire Senate Report upon which the majority rely so heavily is there the remotest implication that Congress desired that an arm of the Cuban Government should be able to raise an act of state defense.
Property is a term that is normally used both in law and in everyday language in its broadest sense. Why there should be a presumption in favor of a definition limiting the term to ‘ ‘ specific ’ ’ property is never explained. To protect innocent parties from multiple liability, there is no need to narrow the definition of property.
In this connection, a footnote in Justice White’s dissent in Sabbatino is most relevant (376 U. S., p. 456, n. 17):
“ In the only reference in the Court’s opinion to fairness between the litigants, and a court’s obligation to resolve disputes justly, ante, p. 435, the Court quickly disposes of this consideration by assuming that the typical act of state case is between an original owner and an ‘ innocent ’ purchaser, so that it is not unjust to leave the purchaser’s title undisturbed by applying the act of state doctrine. Beside the obvious fact that this assumption is wholly inapplicable to the case where the foreign sovereign itself or its agent seeks to have its title *86 validated in our courts — the case at bar — it is far from apparent that most cases represent suits between the original owner and an innocent purchaser. The ‘ innocence ’ of a purchaser who buys goods from a government with knowledge that possession or apparent title was derived from an act patently in violation of international law is highly questionable. More fundamentally, doctrines of commercial law designed to protect the title of a bona fide purchaser can serve to resolve this question without reliance upon a broad irrebuttable presumption of validity.”
In my view, Justice White’s approach should be applied here.
As noted above, the limited reading which the majority places on the phrase “ claim of title or other right to property” has already been rejected in the one Federal case interpreting the statute. In Banco Nacional de Cuba v. First Nat. City Bank of N. Y. (270 F. Supp. 1004 [U. S. Dist. Ct., S. D. N. Y., 1967]) the Banco Nacional, the defendant here, sued the First National City Bank to recover, first, the excess realized by the bank on the sale of collateral held as security for a loan and, second, the deposits of nationalized Cuban banks which First National City Bank held.
First National’s defense was that the Banco Nacional was only an agent for the Bepublic of Cuba, the real party in interest, that Cuba had expropriated its property in Cuba without compensation and that the bank was, therefore, entitled to set off the amount of its claim against Cuba against the excess on the collateral. Banco Nacional argued in part that the setoff was not permitted by the Federal act of state doctrine as defined in the Supreme Court’s decision in Sabbatino. Judge Bryan held that “the holding in Sabbatino was for all practical purposes overruled by the Hickenlooper amendment ’ ’ (270 F. ,Supp. 1004,1007).
In reaching his conclusion Judge Bryan necessarily gave the phrase “claim of title or other right to property” a broad reading since it is apparent that the property which the First National had in its possession was not and had never been confiscated property. Banco Nacional’s claim to the excess was not based upon a confiscation, but the normal rights of a debtor to *87 recover his collateral. Moreover, part of the confiscated res included contractual rights.
Judge Bryan’s opinion correctly states that the “ ultimate act of state doctrine issue boils down to whether the confiscation of First National City’s Cuban property violated principles of international law ” (270 F. Supp. 1004, 1007-1008, supra).
It is also evident that the nub of the issue here is whether Decision No. 346 is a legitimate exercise of a sovereign nation's right to protect its international economic position, in which case we are here dealing with a simple breach of contract, or whether it is rather a disguised act of confiscation. If it is the former, then there is no problem here, since our law has always recognized the validity of regulations by foreign countries to protect their economies. If it is the latter, however, then Hickenlooper applies, and the conflict of laws question is also automatically resolved for we have never given effect to a nation’s act of confiscation insofar as that nation seeks to raise that act either by way of offense or defense.
Briefly stated, the ultimate issue is whether the defendant’s refusal to give the plaintiff “ a check on New York for an equal amount of United States dollars, exempt from the Tax on Exportation of Money ” constitutes a confiscation and, if so, whether it is a violation of international law.
We all accept the defendant’s strenuously urged position that it is a “ governmental instrumentality ” of Cuba. In fact, no one disputes this. It has been nationalized by the Cuban Government and all its property is that of the Government of Cuba. Being an instrumentality of the Cuban Government, it is not an innocent third party, which—under the clear intent of the Congress— can invoke the act of state doctrine to protect itself from multiple liability or to plead impossibility of performance.
Decision No. 346 is an act of defendant’s master and, if that act constitutes a confiscation in contravention of international law, it should be no defense here.
in.
There is sufficient authority in international law for the proposition that a taking of property can occur without first depriving the owner of legal title if the foreigner is effectively deprived *88 of all benefit of the property. (Restatement, 2d, Foreign Relations Law of the United States, § 192 [1965].) Moreover, simply because Decision No. 346 was initially necessitated by Cuba’s need to protect its foreign exchange, it does not follow that it remains valid under international law permanently. (Restatement, 2d, Foreign Relations Law of the United States, § 192, Reporters’ Note 2 [1965].) I see no reason to determine the validity of Decision No. 346 by a simple reference to the date it was enacted, July 15, 1959. Though this might be justified when the currency regulations of a country are in accord with the principles of the International Monetary Fund, even though the enacting country is not a member or has subsequently withdrawn, this view is not justified when these monetary policies are inconsistent with the purpose of the Fund. (International Monetary Fund [U. S. Stat. 1401, 1409], art. VI, § 3. This section contains the limitation that ‘ ‘ no member may exercise these controls in a manner which will restrict payments for current transactions or which will unduly delay transfers of funds in settlement of commitments ”.)
In determining the correct character of Decision No. 346, it must be examined along with a host of other fiscal and economic regulations presently in force in Cuba, which are inextricably intertwined with the Cuban currency laws, in order to ascertain their true effect on respondent’s property. When these other regulations are taken into account, the pernicious character of Decision No. 346 becomes apparent. It is in line with Cuba’s consistent quest to acquire the last remnants of foreign private capital in the country.
As the majority points out, currency regulations which only purport to protect a country’s balance of payments problem by preventing the flight of capital which could be usefully invested domestically or devaluation of the national currency are not violations of international law. But the Cuban monetary and economic regulations we are forced to consider in this case cannot be classified within the ambit of the afore-mentioned category.
The history of the Cuban regime in the last eight years discloses that investment in whatever remains of the private sector of the economy has become impossible. The Cuban Government, by rescinding the tax certificates, has simply added to its cur *89 rency reserves Tby this ploy. This, of course, distinguishes this case from the situations considered by the majority (pp. 55-56).[3]
None of the cases cited by the appellant refute the contention that the currency control regulations of a country must be viewed together with its other 'fiscal regulations in order to determine the actual effect of one regulation and in fact appellant’s counsel on oral argument conceded that this must be done. Appellant cites four cases arising out of Czech currency regulations. However, there is no discussion in these cases of the effect of Czech nationalization orders on these currency controls. These cases were merely decided without reference to other fiscal regulations in force at the time on the basis that the contracts were controlled by the law of the state with the most meaningful contacts (Kahler v. Midland Bank, 2 All E. R. 621 [House of Lords, 1949]; Zivnostenska Banka Nat. Corp. v. Frankman, 2 All E. R. 671 [House of Lords, 1949]; Kraus v. Zivnostenska Banka, 187 Misc. 681 [Sup. Ct. 1946]).
In Peruts v. Bohemian Discount Bank (304 N. Y. 533 [1953]), this court states: “A contract made in a foreign country by citizens thereof and intended by them to be there performed is governed by the law of that country. * * * Our courts may, however, refuse to give effect to a foreign law that is contrary to our public policy. * * * But the Czechoslovakian currency control laws in question cannot here be deemed to be offensive on that score, since our Federal Government and the *90 Czechoslovakian Government are members of the International Monetary Fund ” (p. 537; emphasis added).[4]
A case more nearly in point perhaps than the cases cited in footnote 4 is Matter of Claim of Schwartzenbach Huber Co. (Claim No. Cu-21 [Foreign Claims Settlement Comm., Nov. 30, 1966]; Foreign Claims Settlement Comm., 23 Semiannual Report 58 [1967]). In this case United States goods were shipped to Cuba prior to the passage of Currency Law No. 568. A sight draft attached to the shipment was not honored on the basis of the law. The commission stated: “ after having considered this matter, the Commission holds that Cuban Law 568 and the Cuban Government’s implementation thereof with respect to the rights of the claimants herein was not in reality a legitimate exercise of its sovereign authority to regulate its foreign exchange. Rather, the Commission concludes that the application of this law insofar as the rights of claimant are concerned constituted an intervention by the Government of Cuba into the contractual rights which, in effect, resulted in the taking of American owned property ” (emphasis added).
Cuba’s currency restrictions, when analyzed, make it abundantly clear that no funds can be taken out of Cuba by a foreigner *91 to be exchanged for another foreign currency nor can he purchase goods for export and sell them abroad and thereby get his pesos exchanged into some other currency.[5] It is also equally *92 clear that no blocked funds can be invested by an American in Cuban industry, and that Decision No. 346 is part of a scheme started March 4, 1959 to purge all American ownership from the Cuban economy.[6]
In light of these facts the validity of Decision No. 346 under international law could not conceivably be determined without *93 considering the effect of other Cuban currency and economic regulations upon it. Nor can its validity be sustained merely by referring to the circumstances which justified its enactment or what presently exists as the theoretical justification for its existence. Decision No. 346 must be viewed as one of a great number of regulations enforced to implement the Cuban Government’s policy of expropriating the property of foreigners. Despite the unsettled nature of many international law questions, one certain conclusion is that Cuba’s nationalization program without compensation constitutes a violation of international law (Banco Nacional de Cuba v. Sabbatino, 376 U. S. 398 [dissent, pp. 455-456], supra; First Nat. City Bank v. Banco Nacional de Cuba, supra; Restatement, 2d, Foreign Relations Law of United States, § 192; see, also, Banco Nacional de Cuba v. Farr, supra).
Under the guise of what the majority chooses to call a currency regulation, there has been an expropriation here, and no amount of discussion concerning the currency problems of the postwar world can make it otherwise. This is no devaluation or temporary suspension. Eight years of no payments and no substitute arrangements for making adequate compensation is a sufficient period in which to establish an unlawful taking. Plaintiff’s claim here to the property that she has attached has now become a claim “ based upon * * * a confiscation or other taking * * * in violation of principles of international law”. Consequently, the act of state defense may not be interposed by defendant here. The plaintiff is entitled to judgment.
The order should be affirmed, with costs.
Opinion by Chief Judge Fuld in which Judges Bergan, Jasen and Hopkins* concur, Judge Hopkins in a separate opinion in which Chief Judge Fuld and Judges Bergan and Jasen concur; Judge Burke dissents and votes to affirm in an opinion in which Judges Scileppi and Keating concur, Judge Keating in a separate opinion in which Judges Burke and Scileppi concur.
Order reversed, etc.

. In fact, the words “to property” were not added until 1965.

. There is no doubt that the Sabbatino ease precipitated the amendment, but to read the final version as an overturning of the Sabbatino result only is to ignore most of the legislative history.

. In the so-called “Gold Clause” cases (Norman v. B. & O. R. R. Co., 294 U. S. 240; Nortz v. United States, 294 U. S. 317; Perry v. United States, 294 U. S. 330) the Supreme Court upheld the action of the Congress in nullifying the provisions of private contracts which sought to protect creditors from a devaluation. These cases would seem to be clear authority for the action of the Cuban Government to issue Decision No. 346.
Yet to compare the action of the United States in going off the gold standard to the history of Decision No. 346 is to ask that we ignore the obvious. Although the creditors in the Gold Clause Cases received payment in devalued dollars, their expectations at the time the contracts were made were fully satisfied. The severe deflations of the early 1930’s meant that in fact the devalued dollars had a much greater purchasing power. Here Cuba has not paid anything; nor is there any likelihood that she will.

. Ses, also, Matter of Heddy Brecher-Wolff, Title Claim No. 41668, Docket No. 1698 and Matter of Helbert Wagg & Co., 1 All E. R. 129 (Chancery Ct., 1955) both involving German currency restrictions. These eases similarly are not in point. In Heddy Breaker the opinion of the tribunal included a statement that there is nothing to show that in this case it (the currency controls) had 'been applied in a discriminatory or confiscatory way. And in Helbert Wagg the court’s opinion included this remark: “ English law will not recognize the validity of foreign legislation intended to discriminate against nationals of this country in time of war by legislation which purports to confiscate wholly or in part moveable property situated in the foreign state. As long ago as 1817 such confiscation was described by Lord Eulenborough, C. J., in Wolff v. Oxholm * * * as ‘not conformable to the usage of nations’”. (Id., p. 138.) In Helbert Wagg the German currency regulations, prohibited the payment of foreign creditors in any other currency than German marks which were to be deposited for their account in the central bank. Though there was no discussion of the point in the ease at this time it appears that German currency regulations permitted blocked funds to be utilized for investing in the domestic economy. Thus we have not been directed to any opinion in which a court has properly analyzed the effect of currency restrictions by investigating the purpose these restrictions served for the regimes which imposed them.

. The Cuban Government is presently stringently enforcing the following currency regulations beside Decision No. 346:
(1) By virtue of section 9 of article I of Law 567, banks in Cuba are prohibited from accepting deposits for the credit of or paying cheeks against bank accounts on their books in the names of nonresidents without the prior approval of the Monetary Stabilization Fund.
(2) The proceeds of all exports up until July 15, 1960, as well as funds received in payment for services rendered in Cuba, have to be surrendered for Cuban pesos to the Central Bank within three days after collection.
(3) On July 15, 1960 the Bank for Cuba’s Foreign Trade was granted the monopoly of foreign trade. No private concern after this time could export goods from Cuba.
(4) Tourists or foreigners departing from Cuba are permitted to exchange only 200 pesos against proof of having converted sufficient foreign exchange previously.
(5) Local currency which is held in the name of nonresidents at credit institutions or other agencies in Cuba can be used by these persons only with the express authorization of the national bank.
(6) All transfers in currency abroad in favor of private individuals, state or private enterprises, etc., have to be made through the national bank and paid to the beneficiaries in local currency at the official exchange rate.
(7) Prior authorization is required of the national bank for all exports and transfers to foreign countries of foreign exchange checks, securities, and other kinds of foreign monetary instruments.
(8) No exchange control requirements exist for incoming capital payments by either residents or nonresidents. Outgoing capital payments, however, need the approval of the national bank, the granting of which is subject to indefinite delay.
(9) On August 6 and 7, 1960 a monetary reform was carried out in Cuba providing, among other things, for the replacement of existing Cuban banknotes by new notes. Bach family was permitted to exchange up to 200 old pesos for new pesos on a one to one basis. Larger holdings had to be deposited in special accounts at the national bank, from which up to 1,000 pesos could ■be withdrawn the following week and the balance at the rate of 100 pesos a month. Amounts in excess of 10,000 pesos were confiscated by the government.
(10) A private individual cannot sell any Cuban pesos to a foreigner who requires foreign exchange in order to export goods. (A number of these provisions can be found in Law No. 930 of Feb. 23, 1961, and Law of Sept. 23, 1959. A complete summary of Cuban currency restriction can be found in 11 I. M. F. Ann. Rep. on Exchange Restrictions 93-97 [1960]; 12 I. M. F. Ann. Rep. on Exchange Restrictions 93-96 [1961]; 13 I. M. F. 89-92 [1962].)

. Though it is true now that all means of production are controlled by the Castro Government whether they were originally owned by Cubans, Americans, or other foreigners, the record is still clear that the acts of confiscation were perpetrated first against American companies. To refresh the reader’s recollection the following scenario is offered:
(1) March 4, 1959, the Cuban Government intervened the Cuban Telephone Company, the first intervention of a United States concern.
(2) May 17, 1959, the Cuban Government passes the Agrarian Reform Law. Though the enactment provided for a judicial procedure and compensation for the taking it has never been followed.
(3) October 25, 1959, the Cuban Government imposed confiscatory taxes upon the United States Government owned nickel plant. It also failed to approve the further exportation of nickel.
(4) June 10, 1960, the Cuban Government seized four hotels owned by American concerns.
(5) June 29, 1960, the Cuban Government seized two oil refineries owned by American concerns for failure to process Russian crude oil.
(6) July 6, 1960, the Cuban Government passed Law No. 851, “the nationalization law”, authorizing the expropriation of all United States owned property in retaliation for the reduction in the United States sugar quota. The means provided for compensating the taking was clearly illusory. Payments for the confiscated property were to be made only if the United States purchased a tonnage figure of Cuban sugar never reached by the United States in the previous 10 years and at a higher price than had ever been paid. Payments were then only to be made out of the proceeds above the tonnage limit established. The United States Department of State reported at the time of the passage of this -Cuban expropriation decree that the Cuban Government had already taken over one half of all American owned property in Cuba before the United States sugar quota reduction.
(7) Resolution No. 1 of Law 851 of August 6, 1960 ordered the expropriation of 26 American concerns. This served as the basis for the Sabbatmo case.
(8) Resolution No. 2 of Law 851 of September 17, 1960 nationalized three American owned banks. This served as the basis for the First Nat. City Bank case.
(9) Resolution No. 3 of Law 851 of October 24, 1960 nationalized 166 properties wholly or partially owned by United States citizens. (U. S. Dept. of State for Senate Comm. on Foreign Relations, 88th Cong., 1st Sess., Events in United States-Cuban Relations [Comm. Print, 1963].)

Designated pursuant to section 2 of article VI of the State Constitution in place of Breitel, J., disqualified.